# EXHIBIT 1

FILED
6/9/2021 5:38 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L005966

13631297

| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |

Summons - Alias Summons                                                (03/15/21) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

Scott Kemper

_____ Plaintiff(s)

v.

The Marketing Arm Inc. and
Amy Erschen

_____ Defendant(s)

225 North Michigan Avenue, 14th Floor
Chicago, Illinois 60601

_____ Address of Defendant(s)

Case No. **2021L005966**

Please serve as follows (check one):  ● Certified Mail  ○ Sheriff Service  ○ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

**THERE IS A FEE TO FILE YOUR APPEARANCE.**

**FILING AN APPEARANCE:** Your appearance date is NOT a court date. It is the deadline for filing your appearance/answer. To file your appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE, unless you are unable to eFile your appearance/ answer.** You can download an Appearance form at http://www.illinoiscourts.gov/Forms/ approved/procedures/appearance.asp. After completing and saving your Appearance form, you can electronically file (e-File) it with the circuit clerk's office.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 1 of 3

**Summons - Alias Summons** (03/15/21) CCG 0001 B

**E-FILING:** E-filing is now mandatory with limited exemptions. To e-File, you must first create an account with an e-Filing service provider. Visit http://efile.illinoiscourts.gov/ service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-Filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

**FEE WAIVER:** If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

**COURT DATE:** Your court date will be sent to your e-File email account or the email address you provided to the clerk's office. You can also call or email the clerk's office to request your next court date. You will need to provide your case number OR, if unknown, the name of the Plaintiff or Defendant. For criminal case types, you will also need to provide the Defendant's birthdate.

**REMOTE APPEARANCE:** You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance". Call the Circuit Clerk at (312) 603-5030 or visit their website at www.cookcountyclerkofcourt.org to find out how to do this.

Contact information for each of the Clerk's Office locations is included with this summons. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

○ Atty. No.: 12871
○ Pro Se 99500

Name: Terrill A. Wilkins
Atty. for (if applicable): Scott Kemper
Address: 120 N. LaSalle Street, Suite 1050
City: Chicago
State: IL    Zip: 60602
Telephone: (312) 263-2698
Primary Email: attorneys@avllegal.com

Witness date: 6/9/2021 5:38 PM IRIS Y. MARTINEZ

Iris Y. Martinez, Clerk of Court

☐ Service by Certified Mail: _____
☐ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 3

FILED DATE: 6/9/2021 5:38 PM  2021L005966

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
           OR
           ChildSupCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info:    (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6441

### ALL SUBURBAN CASE TYPES
### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info:    (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info:    (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info:    (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info:    (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info:    (708) 232-4551

FILED DATE: 6/9/2021 5:38 PM    2021L005966

FILED
6/9/2021 5:38 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L005966

13631297

FILED DATE: 6/9/2021 5:38 PM  2021L005966

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| SCOTT KEMPER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2021L005966 |
| | ) |
| THE MARKETING ARM INC. and | ) |
| AMY ERSCHEN, individually, | ) |
| | ) |
| Defendants. | ) **Jury Demanded** |

## COMPLAINT

NOW COMES Plaintiff, SCOTT KEMPER, by and through his attorneys, ABRAHAMSON VORACHEK & RDZANEK, and complains of Defendants, THE MARKETING ARM. INC. ("Defendant" or "TMA") and AMY ERSCHEN ("Ms. Erschen"), individually, as follows:

### PARTIES AND FACTUAL BACKGROUND

1. Count I alleges breach of contract under Illinois common law. Count II is brought to remedy a violation under the Illinois Wage Payment & Collection Act ("IWPCA"), 820 ILCS 115, et seq. (2015).

2. Plaintiff Scott Kemper ("Plaintiff") is a citizen of the State of Illinois.

3. Defendant The Marketing Arm is a Delaware corporation with offices in Chicago, Illinois.

4. On or about December 23, 2019, Plaintiff began his employment with Defendant TMA as Senior Vice President, Executive Director of Production.

5. Plaintiff reported to Defendant Ms. Erschen, Executive Vice President ("EVP") of Culture Marketing, until December 2020, at which time Greg Neal became his direct supervisor with Ms. Erschen still operating as Plaintiff's indirect supervisor.

6. TMA is a subsidiary of Omnicom Group. Plaintiff has worked for other subsidiaries of Omnicom Group for approximately seventeen years.

7. TMA made an offer of employment to Plaintiff in a December 12, 2019 offer letter and accompanying Non-Disclosure, Non-Solicitation and Work-For-Hire Agreement (attached hereto as Exhibit A, and referred to hereafter as "the Agreement"), in which Plaintiff was offered, among other things, annual compensation and benefits. Plaintiff accepted this offer by signing the Agreement on January 7, 2020.

8. The specific terms of Plaintiff's employment with TMA were memorialized in the Agreement with TMA. The Agreement is a valid and enforceable contract for employment under Illinois law.

9. The Agreement provided for, *inter alia*, a severance provision that provided for payment of fifteen (15) weeks of severance or a fifteen (15) week notice period ("the severance") or a combination thereof in the event of Plaintiff's termination of employment. TMA was required to pay the severance unless Plaintiff's employment was terminated "for cause or performance issues or upon [his] disability or death." "Cause" is not defined in the Agreement. (*See* Exh. A., para. 8.)

10. During Plaintiff's tenure at TMA, he fully performed his job and did not have any job performance problems. Specifically, because of Plaintiff's hire and subsequent work with TMA's largest client, State Farm, TMA's revenue increased by over $20 million, despite the economic challenges of the COVID-19 pandemic. Under Plaintiff's lead, State Farm won Ad Age Marketer

2

of the Year and landed its first Superbowl ad spot, including cameo appearance of multiple high profile celebrities during the COVID-19 pandemic, for which Plaintiff was chiefly responsible. That advertisement, now known as "Drake from State Farm," ranked eighth among 70 Superbowl ads that aired and was the highest-rated commercial from a first-time Superbowl advertiser, and one of the only 30-second commercials to make the top ten. To date, the "Drake From State Farm" ad has over *12 million* views on YouTube.

11. Plaintiff also received consistently positive feedback about his work, including via dozens of emails and text messages from a variety of TMA coworkers and subordinates; State Farm employees, including high-level C-suite employees; and outside product vendors who worked with him regularly. Just two weeks, approximately, before the Superbowl, Defendant Ms. Erschen told Plaintiff that they would be discussing various new business opportunities for State Farm once the Superbowl passed. State Farm had been urging Plaintiff to address what it saw as other projects (and challenges around COVID-19 in 2021) for Plaintiff and his team post-Superbowl.

12. With the lucrative Superbowl ad spot secured and the "Drake from State Farm" ad in its final production stages, on January 29, 2021, Defendants fired Plaintiff just five business days before Superbowl weekend. Subsequently, TMA Human Resources ("HR") provided Plaintiff a Separation Agreement and General Release ("the Separation Agreement") that stated that his employment ended on January 31, 2021, and that if he signed the Separation Agreement, his employment end date would be extended to February 10, 2021.

13. Plaintiff was told by Ms. Erschen that he had one day to sign the Separation Agreement "or else" his termination would be immediate rather than on February 10, 2021, despite the

3

Separation Agreement clearly requiring that Plaintiff be given 21 days to consider it, as is required by federal and Illinois law.

14. Defendant Ms. Erschen's suggestion that Plaintiff's termination would be immediate was used as a scare tactic to bully Plaintiff into waiving the legally required 21-day consideration period. Her own statements to Plaintiff in the two weeks leading up to his firing, promising to talk to Plaintiff about new business opportunities "post Superbowl," along with the excellent work he provided at TMA, indicate that Plaintiff was not an employee in danger of a for "cause" termination or that he had performance issues.

15. Upon receipt of the Separation Agreement, Plaintiff was informed verbally and in writing by HR that he was fired because his "assignment [was] completed." The Separation Agreement did not include the severance promised in the Agreement.

16. Plaintiff did not execute the Separation Agreement. Plaintiff's final date of employment was later extended to February 3, 2021, without his signing the Separation Agreement. Plaintiff has not been paid the contractual severance.

## COUNT I – BREACH OF CONTRACT

Plaintiff makes the following allegations against Defendant TMA:

17. Plaintiff repeats and realleges Paragraphs 1-16 as though fully set forth herein.

18. The December 12, 2019 offer letter and accompanying Non-Disclosure, Non-Solicitation and Work-For-Hire Agreement ("the Agreement") is a valid and enforceable contract.

19. Defendant TMA breached the Agreement by terminating Plaintiff's employment and refusing to pay him the severance due to him under the Agreement.

20. Plaintiff suffered pecuniary losses as a result of Defendants' breach.

21. More than three (3) days prior to initiating this lawsuit, Plaintiff made a written demand to Defendant TMA for payment of the severance payment due to him for Defendant's breach of the Agreement, in the amount of $100,961.53.

WHEREFORE, Plaintiff prays for judgment in his favor and against TMA as follows:

a) that this Court find that Defendant TMA breached the Agreement;

b) that this Court order Defendant to pay Plaintiff the severance he is owed under the Agreement;

c) that Plaintiff be awarded his attorneys' fees and costs pursuant to the Attorneys Fees in Wage Actions Act, 705 ILCS 225/1;

d) that this Court award prejudgment interest; and

e) that Plaintiff be awarded such other relief as this Court may deem just and proper.

## COUNT II – IWPCA VIOLATION

Plaintiff makes the following allegations against Defendants TMA and Ms. Erschen:

22. Plaintiff repeats and realleges Paragraphs 1-16 as though fully set forth herein.

23. At all times pertinent hereto, Plaintiff was an employee of Defendant TMA within the meaning of that term under the Illinois Wage Payment & Collection Act ("IWPCA"), 820 ILCS 115/2, in that Plaintiff was hired to perform certain duties for Defendant TMA under its control and direction.

24. At all times pertinent hereto, Defendant TMA was an employer within the meaning of the IWPCA, 820 ILCS 115/2 and 820 ILCS 115/13, and Defendant Ms. Erschen was an officer of TMA.

5

25. The IWPCA, 820 ILCS 115/1, et seq., requires employers to pay in full at the time of separation the final compensation of a separated employee, including all compensation owed to an employee pursuant to a contract.

26. The IWPCA, 820 ILCS 115/13, also mandates that officers of a corporation who knowingly permit an employer to violate the provisions of the IWPCA shall be deemed to be employers of the employees of the corporation.

27. To date, Plaintiff has not been paid all compensation owed to him pursuant to the Agreement with Defendant TMA. Specifically, Defendant TMA failed and refused to pay Plaintiff the severance he is owed under the Agreement.

28. As a result of Defendants' failure to pay Plaintiff the amounts due to him pursuant to the IWPCA, Plaintiff has suffered pecuniary losses.

29. Defendant Ms. Erschen, acting in her capacity as EVP of Culture Marketing of Defendant TMA, knowingly permitted Defendant The Marketing Arm to violate the IWPCA by refusing to pay Plaintiff the payment due to him.

30. The amount due to Plaintiff is easily computed, and the interest due on the payments owed to Plaintiff to date, pursuant to 815 ILCS 205/2, began on February 3, 2021, and continues to accrue until paid.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants as follows:

a) that this Court find that Defendant TMA violated the IWPCA by not paying Plaintiff the remaining compensation he is owed;

b) that this Court find that Defendant Ms. Erschen knowingly permitted Defendant TMA to violate the IWPCA and, thus, is an employer of Plaintiff within the meaning of the IWPCA;

6

FILED DATE: 6/9/2021 5:38 PM 2021L005966

c) that this Court order Defendants TMA and Ms. Erschen (jointly or severally) to pay Plaintiff the compensation owed to him pursuant to the Agreement;

d) that this Court assess all applicable civil and criminal penalties to all Defendants, as enumerated in the IWPCA, 820 ILCS 115/14;

e) that this Court award interest in the amount of 2% of the compensation owed to Plaintiff pursuant to the Agreement for each month following the date of payment during which the compensation owed to Plaintiff remains unpaid, pursuant to the IWPCA, 820 ILCS 115/14 (a);

f) that this Court order Defendants to pay all costs and attorneys' fees Plaintiff has incurred, pursuant to the IWPCA, 820 ILCS 115/14(a);

g) that this Court award prejudgment interest pursuant to 815 ILCS 205/2; and

h) that this Court order such other relief as it may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all counts of his Complaint.

Respectfully submitted,

/s/ Vicki Lafer Abrahamson

Vicki Lafer Abrahamson
Terrill A. Wilkins
ABRAHAMSON VORACHEK & LEVINSON
120 North LaSalle Street, Suite 1050
Chicago, Illinois 60602
312/263-2698
attorneys@avllegal.com

Attorneys for Plaintiff

DATED:     June 9, 2021



December 12, 2019

FILED
6/9/2021 5:38 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L005966

Mr. Scott Kemper
Via Email

Dear Scott:

On behalf of The Marketing Arm (the "Company"), I am pleased to confirm our employment offer to you effective December 23, 2019 working as SVP, Executive Director of Production out of our Chicago, Illinois office under the following terms and conditions:

## COMPENSATION

You will receive an initial base semi-monthly salary of $14,583.33 with a yearly equivalent of $350,000.00 prorated from the date of your employment. This includes all salary and vacation pay and is subject to standard withholdings. In light of the nature of your position with the Company, you will be exempt from overtime laws. Accordingly, your salary will be your total compensation for all hours that you work. The Marketing Arm pays semi-monthly on the 15th and last day of the month. If, at any point, you are awarded additional compensation during your employment with The Marketing Arm, any such compensation will only be distributed in the event you remain employed on the date Company renders payment.

## BENEFITS

You will be entitled to participate in any present or future employee benefit programs established by The Marketing Arm for its employees generally or for all employees at your organizational level, subject to our right to modify or terminate such benefit plans or programs at any time in our sole discretion, and to the eligibility requirements and rules of each such plan or program.

You become eligible for benefits on the first of the month after you complete one month of employment. While coverage begins on February 1, 2020, you should be aware that our plan, like virtually all health insurance programs, may have certain restrictions. If you have any questions on this point you should feel free to contact My HR Service Center at (888) 977-8490. Our benefit package includes medical, dental and vision.

You will also be eligible to participate in Omnicom's 401(k) plan upon hire and as soon as it is administratively feasible. Information will be forwarded to you shortly after your hire date. In addition, you will be eligible to participate in Omnicom's Employee Stock Purchase Plan after six months of employment and at the next open enrollment period. Employees are able to nominate up to 10% of gross pay to be set aside to acquire Omnicom Group Inc. (NYSE:OMC) stock.

The Company agrees to reimburse you up to $300 gross (net applicable taxes) per month to park in the Michigan Plaza Building or another location of your choosing. You must submit an expense report for such expense in accordance with Company's Business Expense Policy. This benefit is provided to you as additional consideration for your agreement to the Non-Disclosure, Non-Solicitation and Work-For-Hire Agreement attached to this Letter.

After two months of employment you are eligible for five week's pro-rated vacation per year subject to the terms and conditions of company policy.

EXHIBIT A

## EMPLOYMENT AT WILL / SEVERANCE

For purposes of the Company's severance policies, your prior Omnicom service will be counted. Accordingly, should the Company terminate your employment (other than for cause or performance issues or upon your disability or death), the Company will provide you with a fifteen (15) week severance or notice period. The Company may elect whether to provide notice, severance, or a combination of the two. With respect to any portion of your severance/notice which the Company elects to pay as severance, such severance is contingent upon execution of the Company's standard form of separation agreement and general release of claims, and after the revocation period and other conditions applicable to the validity of such agreement, if any, have expired or been fully satisfied. Payment of severance is subject to the terms of such separation agreement and will be paid based on your base salary at the time of your termination (according to standard payroll practices in place at the time). All payments to you in respect to the severance/notice set forth herein will be in lieu of any amount to which you would otherwise be entitled under the Company's severance policy in effect at any time.

Other than as noted in the severance/notice terms described herein, the Company can terminate your employment at any time without notice as your employment is at-will.

## CONFIDENTIAL INFORMATION, WORK FOR HIRE AND COVENANT AGREEMENT / COMPANY POLICIES

As a condition of your employment, you will be required to sign a Work for Hire and Covenant Agreement, a copy of which is attached, as well as the Company's Confidential Information. You are also required to know and comply with the Company's employment policies, including but not limited to the Company's anti-harassment and discrimination policy. In addition, you may also be required to sign and comply with any policies and procedures required by a Company client for whom you may be doing work.

## REPRESENTATIONS

You represent that you are not a party to any agreement with any prior employer, or any other entity, that would seek to prohibit your employment with the Company, or otherwise limit the type of work that the Company may ask you to do or the clients for whom the Company may ask you to render services. You understand and agree that you are prohibited from bringing with you to the Company, or disclosing or using in any way, any documents or information, whether electronic or otherwise, that are confidential or otherwise proprietary to any prior employer, its clients or any other entity. Any breach of these representations will be considered grounds for termination of your employment for cause.

## TERMS OF OFFER: EMPLOYMENT AUTHORIZATION AND CURRENT RESTRICTIVE COVENANTS

The Marketing Arm extends this offer contingent on verification of prior employment, educational information and satisfactory results from our reference and background checks. In accordance with U.S. Immigration Reform and Control Act of 1986, we are required to establish the employment authorization and identity of each employee. As such, you must bring the appropriate identification on the first day that you report to work.

By signing this agreement, you acknowledge that you do not have confidentiality, non-solicitation or non-compete agreements that would restrict you from working at the Company or on any of its client's business.

FILED DATE: 6/9/2021 5:38 PM 2021L005966

FILED DATE: 6/9/2021 5:38 PM  2021L005966

## ENTIRE AGREEMENT

This letter contains the entire agreement between us. You acknowledge that you have not relied upon any representations (oral or otherwise) other than those explicitly stated in this offer letter.

We are very excited about you joining The Marketing Arm and wish you every success in your new position. If I can be of any assistance, please do not hesitate to contact me at (214) 259-3291.

Sincerely,

*Tanya Stoller*

Tanya Stoller
Human Resources Director

I confirm my acceptance of employment with The Marketing Arm, subject to the terms and conditions set forth above.

Scott Kemper                                  1/7/20
                                              Date

## NON-DISCLOSURE, NON-SOLICITATION AND WORK-FOR-HIRE AGREEMENT

In consideration of your employment with or provision of services to The Marketing Arm, Inc. (the "Company") and for other good and valuable consideration, receipt of which is hereby acknowledged, you agree as follows:

1. In the course of your employment with or provision of services to the Company, you have and will have acquired and have had access to confidential or proprietary information about the Company and/or its clients and/or customers, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Company and its clients and/or customers, the Company's client lists, the Company's client contacts, the Company's editorial, marketing and/or creative policies, practices, concepts, strategies, and methods of operations, internal policies, pricing policies and procedures, cost estimates, engagement planning materials, employee lists, training manuals, financial or business projections, and information about or received from clients and other companies with which the Company does business. The foregoing shall be collectively referred to as "confidential information." You are aware that the confidential information is not readily available to the public. You agree that during your employment or provision of services and thereafter, you will keep confidential and not disclose the confidential information to anyone or use it for your own benefit or for the benefit of others, except in performing your duties as our employee or agent. You agree that this restriction shall apply whether or not any such information is marked "confidential."

2. All memoranda, disks, files, notes, records or other documents, whether in electronic form or hard copy (collectively, the "material") compiled by you or made available to you during your employment (whether or not the material contains confidential information) are the property of the Company and shall be delivered to the Company on the termination of your employment or at any other time upon request. Except in connection with your employment, you agree that you will not make or retain copies or excerpts of the material, nor will you modify, download, transmit, delete or erase any electronic form of the material.

3. You agree that your position with the Company requires and will continue to require the performance of services which are special, unique, extraordinary and of an intellectual character and places you in a position of confidence and trust with the clients and employees of the Company. You further acknowledge that the rendering of services to the Company's clients necessarily requires the disclosure of confidential information and trade secrets of the Company. You agree that in the course of your employment with or rendering of services to the Company, you will develop a personal acquaintanceship and relationship with the clients of the Company and a knowledge of those clients' affairs and requirements. Consequently, you agree that it is reasonable and necessary for the protection of the confidential information, near-permanent customer and/or client relationships and business of the Company that you make the covenants contained herein. Accordingly, you agree that while you are in the Company's employ and for the one year period after the termination of your employment, for any reason whatsoever, you shall not directly or indirectly, except on behalf of the Company:

(a) attempt in any manner to solicit or accept from or discuss with any Client (as defined below) business of the type performed by the Company or to persuade any Client to cease to do business or to reduce the amount of business which any such Client has customarily done or is reasonably expected to do with the Company, whether or not the relationship between the Company and such Client was originally established in whole or in part through your efforts; or

(b) employ as an employee or retain as a consultant any person who is then or at any time during the preceding twelve months was an employee of or exclusive consultant to the Company (unless the Company had terminated the employment or engagement of such employee or exclusive consultant prior to the time of your alleged prohibited conduct), or persuade or attempt to persuade any employee of or exclusive consultant to the Company to leave the employ of the Company or to become employed as an

FILED DATE: 6/9/2021 5:38 PM   2021L005966

employee or retained as a consultant by anyone other than the Company; or

    (c)  render to or for any Client any services of the type rendered by the Company.

As used in this paragraph 3, the term "Company" shall include all subsidiaries of the Company; and the term "Client" shall mean (1) anyone who is a client of the Company at the time your employment is terminated, or, if your employment shall not have terminated, at the time of your alleged prohibited conduct (any such applicable date being called the "Determination Date"), but only if you had a direct relationship with, supervisory responsibility for or otherwise were significantly involved with such client during your employment with the Company; (2) anyone who was a client of the Company at any time during the one year period immediately preceding the Determination Date, but only if you had a direct relationship with, supervisory responsibility for or otherwise were significantly involved with such client during your employment with the Company; (3) any prospective client to whom the Company had made a new business presentation (or similar offering of services) at any time during the one year period immediately preceding the Determination Date, but only if you participated in or supervised such presentation and/or the preparation therefore or the discussions leading up thereto; and (4) any prospective client to whom the Company made a new business presentation (or similar offering of services) at any time within six months after your termination of employment, but only if the initial discussions between the Company and such prospective client relating to the rendering of services occurred prior to your termination of employment, and only if you participated in or supervised such presentation and/or the preparation therefore or the discussions leading up thereto.

With respect to paragraphs (a) and (c) of this Section 3, it is agreed such restrictions will not prohibit you from working for a competitor of the Company on the State Farm account, or working for State Farm directly in any capacity whatsoever, after the conclusion of your employment with the Company, upon the occurrence of any of the following events: (i) the Company terminates your employment without cause, (ii) you provide the Company with no less than thirty (30) day written notice of termination of your employment with the Company, during which time you will continue servicing Company in your current role unless otherwise directed by the Company, or (iii) the Company provides written consent releasing you from your obligations under Section 3. In all other circumstances, the restrictions set forth in this Section 3 shall apply.

For purposes of this clause, it is agreed that a general mailing or an incidental contact shall not be deemed a "new business presentation or similar offering of services" or a "discussion". In addition, if the client is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "client" as used herein shall also include each entity, division and operating unit of the Client Group for whom the Company also renders services where the same management group of the Client Group has the decision making authority or significant influence with respect to contracting for services of the type rendered by the Company.

    4.  You agree that any actual or threatened breach by you of the covenants set forth in paragraphs 1, 2 and 3 of this agreement would result in irreparable harm to the Company for which monetary damages alone would be an insufficient remedy. Thus, although nothing in this paragraph will prohibit the Company from pursuing any remedies available to it against you under applicable law (which shall be cumulative with those remedies set forth herein), you specifically agree that, in the event of any threatened or actual breach of this agreement by you, the Company shall be entitled to a temporary restraining order and, thereafter, a preliminary and permanent injunction and other equitable relief including, without limitation, an equitable accounting of earnings, profits, and other benefits, from a court of competent jurisdiction, as well as reimbursement from you for any attorneys' fees and other costs incurred by the Company in obtaining such relief. No specification in this agreement of any legal or equitable remedy shall be construed as a waiver or prohibition against pursuing any other legal or equitable remedies in the event of a threatened or actual breach of this agreement by you.

    5.  (a)  You hereby assign to the Company, or its designee, all your right, title, and interest in and to any and all Works, original works of authorship, developments, concepts, improvements or

FILED DATE: 6/9/2021 5:38 PM 2021L005966

prohibition against pursuing any other legal or equitable remedies in the event of a threatened or actual breach of this agreement by you.

5. (a) You hereby assign to the Company, or its designee, all your right, title, and interest in and to any and all Works, original works of authorship, developments, concepts, improvements or trade secrets, which you may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed, during your employment and which (i) relate to the Company's business, (ii) result from any work performed for the Company, or (iii) result from any use of the Company's equipment, supplies, facilities or Confidential Information (collectively referred to as "Works"). You further acknowledge that all original works of authorship which are made by you (solely or jointly with others) within the scope of this Agreement and during your employment and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act. If for any reason any portion of the Works do not qualify as works made for hire, that you hereby transfer and assign to the Company all right, title and interest in and to the Works, including the Copyright therein.

(b) You agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Works and any copyrights, or other intellectual property rights relating thereto, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights.

6. You represent and warrant that you are not subject to any agreement, instrument, order, judgment or decree of any kind, or any other restrictive agreement of any character, which would subject Company to potential litigation, prevent you from entering into this Agreement or which would be breached by you upon your performance of your duties pursuant to this Agreement.

7. If any provision of this agreement, or any part thereof, is found to be invalid or unenforceable, the same shall not affect the remaining provisions, which shall be given full effect, without regard to the invalid portions. Moreover, if any one or more of the provisions contained in this agreement shall be held to be excessively broad as to duration, scope, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent with applicable law.

8. You agree that this agreement shall survive the termination of your employment with or provision of services to the Company.

9. This agreement is limited to the foregoing terms and shall not be construed to create any relationship between you and the Company other than at-will employment for all purposes. This agreement supersedes all agreements concerning the subject matter hereof.

10. The terms of this agreement and all rights and obligations of the parties thereto including its enforcement shall be interpreted and governed by the laws of the state of Illinois.

AGREED TO AND ACCEPTED:

Signature: _____ (Scott Kemper)    Print Name: Scott Kemper

Date: 1/7/20